**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ILLINOIS**


**RUTH HAMERSKI**

       **Plaintiff,**

**vs.**

**BELLEVILLE AREA SPECIAL**         **Case No. 16-cv-796-DRH-DGW**
**SERVICES COOPERATIVE,**

       **Defendant.**

**MEMORANDUM and ORDER**

**HERNDON, District Judge:**

## I.    **Introduction**

Now before the Court is defendant, Belleville Area Special Services Cooperative (hereinafter "BASSC"), motion to dismiss plaintiff's first amended complaint (Doc. 15) pursuant to FEDERAL RULE OF CIVIL PROCEDURE 12(b)(6). Plaintiff Ruth Hamerski (hereinafter "Hamerski"), opposes the motion on grounds that she has pled sufficient facts to meet the standard for Rule 12(b)(6) dismissal (Docs. 25 & 26). For the reasons explained below, the Court **DENIES** defendant's motion to dismiss (Doc. 23).


## II.    **Background**

Plaintiff began her employment with defendant BASSC on July 1, 2007, as an administrator for instructional programs. (Doc. 15, ¶ 5). At that time, she had twenty-six years of experience as a teacher and special education department

chair at Mt. Vernon High School. (Doc. 15, ¶ 5). BASSC is a federally funded educational cooperative that implements and enforces the Individuals with Disabilities Education Act (hereinafter "IDEA"). (Doc. 15, ¶ 4). It provides special education services to children between elementary and high school levels that have qualified disabilities under the Americans with Disabilities Act (hereinafter "ADA"), and whom are entitled to special education under the IDEA. (Doc. 15, ¶ 5).

In 2008, plaintiff was assigned to be the interim principal of Pathways school. (Doc. 15, ¶ 7). Plaintiff soon found Pathways was "both legally and ethically in violation" of the ADA and IDEA. (Doc. 15, ¶ 7). The children were allegedly "routinely being arrested by the police at the staff members' behest as a means of control," with a resulting criminal charge of "disturbing the peace...." (Doc. 15, ¶ 7). As a result of a hostile environment between the staff and students, plaintiff created "written policies restricting the use of arrests, isolation, seclusion and restraint." (Doc. 15, ¶ 7).

Plaintiff alleges that one paraprofessional, Melissa Stines, had to be removed by plaintiff from the high school and elementary school due to "her inability to control her own behavior with students." (Doc. 15, ¶ 8). Plaintiff allegedly had to have Ms. Stines escorted off the campus after she went on a "tirade with young students present" and refused to leave the building. (Doc. 15, ¶ 8). Ms. Stines then allegedly "physically threatened Plaintiff, and... upon

resigning from BASSC, promised that Plaintiff 'will hear from me again.'" (Doc. 15, ¶ 8).

Ms. Stines was and continues to be married to Matt Stines, who at the time was "being groomed to become a superintendent at Grant Illini" school. (Doc. 15, ¶ 9). This would entitle Mr. Stines to membership on the BASSC executive board, which consisted of the superintendents from the twenty-three member schools. (Doc. 15, ¶ 9). Plaintiff alleges that Mr. Stines "complained repeatedly in derogatory terms" to her supervisor, BASSC executive director Jeff Daugherty. (Doc. 15, ¶ 9). In 2009, Mr. Stines formed a committee to study and oversee the Pathways School. (Doc. 15, ¶ 9). He also allegedly sought to keep plaintiff from membership, despite her job description including oversight of the School's programs. (Doc. 15, ¶ 9). Mr. Stines became the chair of the executive committee in 2011. (Doc. 15, ¶ 10).

In 2013, plaintiff announced that she intended to retire in 2017 or 2018. (Doc. 15, ¶ 10). Plaintiff alleges that she was entitled to receive a 6% pay increase over her final four years at Pathways School, but that Mr. Stines only offered her a 3% raise. (Doc. 15, ¶ 10). According to plaintiff, this offering was "approximately one-half the dollar amount that was given to the last retiring administrator, and the [same as] current retiring teachers." (Doc. 15, ¶ 10). On October 16, 2013, however, plaintiff and defendant entered into a four year written contract that stated she could only be discharged "for just cause." (Doc. 15, ¶ 11). If dismissal were to occur, plaintiff would be entitled to written notice of the charges, notice of

hearing, a full hearing to confront and cross-examine witnesses and evidence, and representation by legal counsel. (Doc. 15, ¶ 11).

Between 2007 and January 2015, plaintiff states that she received "'excellent' in virtually every category" of her annual performance appraisals conducted by executive director Daugherty. (Doc. 15, ¶ 12). In 2015, however, plaintiff states that she would have "latent, unresolved issues in the mind of Matt Stines, and his wife, Melissa Stines." (Doc. 15, ¶ 13). Mr. Stines, in his capacity as chair and president of the executive board, allegedly hired his counsel of record to investigate plaintiff. (Doc. 15, ¶ 14). Plaintiff was subsequently informed on March 13, 2015, by executive director Daugherty that she was being criticized by three subordinates regarding the implementation of the above referenced written policies. (Doc. 15, ¶ 15). Plaintiff states her policies were compliant with the IDEA and were actually adopted and approved by the BASSC executive board, as well as the Pathways committee on which Mr. Stines was the chairman. (Doc. 15, ¶ 15). Thus, plaintiff alleges she was being criticized "by the very people that approved" the policies. (Doc. 15, ¶ 15).

In that same March 13, 2015, discussion, plaintiff was informed that both she and Mr. Daugherty were to appear at the law office of Barney Mundorf on Monday, March 16, 2015, regarding the investigation ordered by Mr. Stines. (Doc. 15, ¶ 16). Mr. Daugherty and plaintiff were allegedly instructed not to talk to each other over the weekend. (Doc. 15, ¶ 16). Plaintiff states that when she appeared, she was not allowed to explain the accusations being made by Mr. Mundorf. (Doc.

15, ¶ 17). The accusations allegedly included the following: (1) "being negligent in her duties regarding training of teachers"; (2) "lying about eight (8) claimed work days in July, 2014"; (3) "her IDEA instructions on restraint and arrest of children from calendar year 2008 at Pathways"; and, (4) "whether she told a subordinate administrator to keep illegal, confiscated drugs in his desk." (Doc. 15, ¶ 17). These allegations, according to Mr. Mundorf, were coming from the same three subordinate employees who had criticized plaintiff, and whom were allegedly sought out by Mr. Stines. (Doc. 15, ¶ 18). Plaintiff states those subordinates are only three of fifty-four over which she had direct supervision, and three of eighty-three over which she had indirect supervision. (Doc. 15, ¶ 18).

On March 18, 2015, Jeff Daugherty and plaintiff were then summoned to a full executive board meeting, at which neither were allegedly allowed to talk. (Doc. 15, ¶ 19). Instead, Mr. Stines and Mr. Mundorf presented the findings of their investigation to the other superintendents. (Doc. 15, ¶ 19). The full board then allegedly went into a closed session, but took no action or votes regarding Mr. Daugherty or plaintiff's employment. (Doc. 15, ¶ 19). Following the meeting, Mr. Stines and Mr. Mundorf allegedly took Mr. Daugherty and plaintiff individually into a conference room. (Doc. 15, ¶ 20). First, Mr. Stines and Mr. Mundorf spoke to Mr. Daugherty, at which point plaintiff claims a "tactic [was] employed… [to] accus[e] him of improper conduct, [which] removed him from advocating for Plaintiff." (Doc. 15, ¶ 20). His employment was not threatened. (Doc. 15, ¶ 20).

Second, plaintiff was informed that the "'most serious act of misconduct alleged against her was her enforcement of the BASSC policy regarding IDEA student arrests and restraints from calendar year 2008." (Doc. 15, ¶ 21). Thus, plaintiff believes she was being criticized for advocating for IDEA students. (Doc. 15, ¶ 21). The conversation ended with plaintiff being informed that she had the two following options: (1) "retire on June 30, 2015, at her current pay level"; or, (2) "be demoted and reassigned as a teacher with substantially less pay." (Doc. 15, ¶ 21). The following day, March 19, 2015, plaintiff received a written letter memorializing the two options and giving her four days to make a decision. (Doc. 15, ¶ 22). Plaintiff claims that at no time was she given the opportunity to present her side of the accusations, have a hearing to confront and cross-examine her accusers, or present her own evidence and be represented by counsel. (Doc. 15, ¶ 23).

### III.  **Motion to Dismiss**

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) challenges the sufficiency of the complaint for failure to state a claim upon which relief may be granted. *Gen. Hallinan v. Fraternal Order of Police Chicago Lodge No. 7*, 570 F.3d 811, 820 (7th Cir. 2009). The Supreme Court explained in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007), that to withstand Rule 12(b)(6) dismissal, a complaint "does not need detailed factual allegations," but must contain "enough facts to state a claim for relief that is plausible on its face." 550 U.S. at 570.

*Twombly* and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), retooled federal pleading standards, but notice pleading remains all that is required in a complaint. "A plaintiff still must provide only 'enough detail to give the defendant fair notice of what the claim is and the grounds upon which it rests and, through his allegations, show that it is plausible, rather than merely speculative, that he is entitled to relief.'" *Tamayo v. Blagojevich*, 526 F.3d 1074, 1083 (7th Cir. 2008) (citation omitted). In making this assessment, the district court accepts as true all well-pleaded factual allegations and draws all reasonable inferences in the plaintiff's favor. *See Rujawitz v. Martin*, 561 F.3d 685, 688 (7th Cir. 2009); *St. John's United Church of Christ v. City of Chi.,* 502 F.3d 616, 625 (7th Cir. 2007).

The above standard applies to civil rights and municipal liability cases, as "a federal court may not apply a heightened pleading standard more stringent than the usual Rule 8(a) pleading requirements." *See Estate of Sims ex rel. Sims v. Cnty of Bureau*, 506 F.3d 509, 514 (7th Cir. 2007) (citing *Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit*, 507 U.S. 163, 165 (1993)). In particular, the Seventh Circuit has acknowledged that "district courts continue to struggle with… exactly what a plaintiff bringing a municipal liability suit must plead to survive a motion to dismiss.…" *See McCormick v. City of Chicago*, 230 F.3d 319, 324 (7th Cir. 2000). For this reason, it clarified in *McCormick* that notice pleading is all that is required, as "plaintiff need not 'allege all, or any of the facts logically entailed by the claim… A plaintiff does not have to plead evidence…. [A] complaint does not fail to state a claim merely because it

does not set forth a complete and convincing picture of the alleged wrongdoing.'" *Id.* at 325 (quoting *Payton v. Rush-Presbyterian-St. Luke's Medical Center*, 184 F.3d 623, 626-27 (7th Cir. 1999) (internal citations omitted)).

## IV. <u>Analysis</u>

Plaintiff believes her two employment options were "calculated to force [her] to quit- a constructive discharge." (Doc. 15, ¶ 24). That is, she does not believe anyone "in their right mind would" accept a demotion from an administrative to a teaching position, thereby significantly reducing her salary in the years from which her retirement pay would be calculated. (Doc. 15, ¶ 24). As a result, she brings her five count first amended complaint. The counts allege as follows: (1) a violation of plaintiff's property interest in employment by virtue of her written contract under the Fourteenth Amendment of the United States Constitution; (2) a violation of plaintiff's due process rights under the Fourteenth Amendment of the United States Constitution for not affording a "name-clearing" hearing; (3) a violation of plaintiff's liberty interest under the Fourteenth Amendment of the United States Constitution for accusing her of "illegal acts, incompetence, and unfitness in her profession"; (4) a violation of Titles I and II of the ADA for retaliating against plaintiff after she advocated for the students protected under that statute and the IDEA; and, (5) a breach of plaintiff's employment contract. (Doc. 15, ¶ 25). Each count will be analyzed in turn.

### a. <u>Count I: Violation of Fourteenth Amendment Property Rights.</u>

Under count I, plaintiff states that she possessed a property interest in her continuing employment by virtue of a written contract, which contained a "for cause" provision and ran through June 2017. (Doc. 15, ¶ 26). Defendant allegedly violated this property interest and, thus, the Fourteenth Amendment when it constructively discharged plaintiff without due process. (Doc. 15, ¶ 26). As will be discussed, plaintiff pled sufficient facts for the allegations contained in count I.

The Fourteenth Amendment procedural protection of property is a "safeguard of the security of interests that a person has already acquired in specific benefits. These interests… may take many forms." *Board of Regents v. Roth*, 408 U.S. 564, 576 (1972). The Supreme Court has held that dismissals during the term of a contract create interests in continued employment that are safeguarded by due process. *Id.* at 576-77 (citing *Slochower v. Board of Education*, 350 U.S. 551, 559 (1956); *Wieman v. Updegraff*, 344 U.S. 183 (1952)). Individuals claiming these interests must have "a legitimate claim of entitlement to it," rather than an "abstract need or desire for it… [or] a unilateral expectation of it." *Id.*; *See* also *Cole v. Milwaukee Area Technical College Dist.*, 634 F.3d 901, 904 (7th Cir. 2011).

Whether or not the plaintiff has a property interest in continued employment is a question of state law. *Redd v. Nolan*, 663 F.3d 287, 296 (7th Cir. 2011) (citing *Id.*); *See* also *Cole*, 634 F.3d at 904. It must be shown that "a state law, an ordinance, a contract, or some other understanding" limited the

employer's ability to discharge the plaintiff. *Id.* (citing *Krecek v. Board of Police Comm'rs of La Grange Park*, 646 N.E.2d 1314, 1318-19 (Ill. App. Ct. 1995); *See also Palka v. Shelton*, 623 F.3d 447, 452 (7th Cir. 2010). In the case of a contract, a plaintiff generally must show that the terms provide for termination "only 'for cause' or otherwise evince 'mutually explicit understandings' of continued employment." *Cole*, 634 F.3d at 904 (citing *Omosegbon v. Wells* 335 F.3d 668, 674 (7th Cir. 2003) (internal citations omitted)). It is in this way that a property interest is "created and defined by the terms of [the employee's] appointment," and the "employer's discretion is clearly limited so that the employee cannot be denied employment unless specific conditions are met." *Id.* (quoting *Roth*, 408 U.S. at 578; *Colburn v. Trs. Of Ind. Univ.*, 973 F.2d 581, 589 (7th Cir. 1992)).

Further, an employee cannot voluntarily resign and then complain about a lack of due process. *Palka*, 623 F.3d at 453 (citing *Dusanek v. Hannon*, 677 F.2d 538, 543 (7th Cir. 1982)). However, an "involuntary" resignation, such as a constructive discharge, can sometimes form the basis for a due process claim. *Id.* A constructive discharge occurs when, from the standpoint of a reasonable employee, an employer "makes employment so unbearable that an employee resigns...." *Id.* It has been held that "[w]hen an employer acts in a manner so as to have communicated to a reasonable employee that she will be terminated, and the plaintiff employee resigns, the employer's conduct may amount to a constructive discharge." *E.E.O.C. v. University of Chicago Hospitals*, 276 F.3d 326, 332 (7th Cir. 2002). That is, when "'the handwriting [was] on the wall' and the axe was

about to fall," employment could have been so unbearable as to make a reasonable person resign. *Id.* (quoting *Lindale v. Tokheim Corp.*, 145 F.3d 953, 956 (7th Cir. 1998)).

Defendant argues that count I should be dismissed because "Plaintiff has not alleged working conditions 'so intolerable that a reasonable person would [feel] compelled to resign.'" (Doc. 23, ¶ 2; Doc. 24, pg. 3) (citing *Patton v. Keystone RV co.*, 455 F.3d 812, 818 (7th Cir. 2006; *Witte v. Wisconsin Department of Corrections*, 434 F.3d 1031, 1035 (7th Cir. 2006) (internal citations omitted)). In fact, defendant argues that the facts reveal "working conditions were generally positive for Plaintiff," as evidenced by her annual performance appraisals, guaranteed pay increases, and a four year employment contract. (Doc. 24, pg. 4). According to defendant, it was "the investigation into her misconduct and the possibility of formal discipline charges" that led to her "voluntary resign[ation,]" i.e. the two options she was offered following the conclusion of the investigation. (Doc. 24, pg. 4) (emphasis added). Thus, defendant's arguments are premised on the belief that neither being accused of wrongdoing, nor making a reasoned decision to relinquish a position after weighing all options, amount to a constructive discharge. (Doc. 24, pg. 5) (citing *Swearnigen-El v. Cook County Sheriff's Department*, 602 F.3d 852, 859 (7th Cir. 2010) and *Dudycz v. City of Chicago*, 563 N.E.2d 1122, 1127 (Ill. App. Ct. 1990)).

Conversely, plaintiff argues that when faced with the choice between early retirement and an involuntary demotion, which would "drastically reduc[e] her

retirement pay and benefits," she really had no choice at all. (Doc. 25, pg. 1). As a result of the written letter memorializing her two options, plaintiff believes her property interest was lost to "a predetermined decision…." (Doc. 25, pg. 1). She would have been "reclassified from an administrator's salary to a lower paying teaching position…." (Doc. 26, pg. 4). In plaintiff's view, "[n]o one in their right mind would cho[ose] to retire at a teacher's salary, when they had earned an administrator's retirement salary after thirty-four (34) years." (Doc. 26, pg. 4).

Plaintiff responds to defendant's "voluntary decision" and "reasoned decision" arguments by stating that "this is a jury's decision to make." (Doc. 26, pg. 6). Further, she argues that such an inquiry is objective; thus, we must ask if "working conditions [had] become so intolerable that a reasonable person in the employee's position would have felt compelled to resign." (Doc. 26, pg. 6) (citing *Pennsylvania State Police v. Suders*, 542 U.S. 129, 130 (2004)). *Suders*, in plaintiff's opinion, reveals facts analogous to those now before the Court, and supports her contention that the deprivation of her property interest occurred when she was placed in the untenable position of having to choose between resigning at her current salary and being demoted. (Doc. 26, pg. 6).

Here, the Court finds that plaintiff has pled sufficient facts to support her allegations and state a claim for violations to her property interest in continuing employment. These allegations also indicate the claim to relief is plausible on the face of the complaint. Specifically, plaintiff has alleged that she acquired specific benefits in employment and, thus, has a legitimate claim of entitlement to

continue that employment per her written contract and "for cause" provision. These allegations suffice because, as recognized by Illinois state law, the contract's terms allegedly limited defendant's ability to discharge plaintiff absent cause and certain due process procedures. When accepted as true, these allegations tend to show that there was a "mutually explicit understanding" that specific conditions needed to be met *before* plaintiff's interests in employment were denied through the alleged "predetermined outcomes." It is well-settled that a constructive discharge can form the basis of a due process claim if employment has become so unbearable that the employee resigns. This question is judged objectively. It is certainly plausible that when placed under the same circumstances as plaintiff in this case, a reasonable person would have felt employment had become unbearable and, thus, compelled to resign. That is not a question for this Court to decide. For now, plaintiff's well-pleaded facts must be accepted as true.

### b. Count II: Violation of Fourteenth Amendment Due Process Rights.

Under count II, plaintiff states that both her employment contract and the due process clause of the Fourteenth Amendment required defendant to provide her with notice of the charges, a hearing to confront and cross-examine adverse witnesses, the opportunity to present witnesses on her behalf, and the opportunity for representation by counsel. (Doc. 15, ¶ 33). Her Fourteenth Amendment due process rights were allegedly denied when she did not receive the "pre-discharge, 'name-clearing' hearing." (Doc. 15, ¶ 34). As will be discussed, plaintiff pled sufficient facts for the allegations contained in count II.

A procedural due process violation occurs when "(1) conduct by someone acting under the color of state law; (2) deprives the plaintiff of a protected property interest; (3) without due process of law." *Redd*, 663 F.3d at 296 (internal citation omitted). The Supreme Court has consistently held that "some form of hearing is required before an individual is finally deprived of a property interest." *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976) (citing *Wolff v. McDonnell*, 418 U.S. 539, 557-58 (1974) (internal citations omitted)); *See* also *Roth*, 408 U.S. at 570-71 ("When protected interests are implicated, the right to some kind of prior hearing is paramount."). This is because the "right to be heard before being condemned to suffer grievous loss of any kind... is a principle basic to our society." *Id.* (quoting *Joint Anti-Fascist Comm. v. McGrath*, 341 U.S. 123, 168 (1951) (Frankfurter, J., concurring)). Further, due process requires the opportunity to be heard "at a meaningful time and in a meaningful manner." *Id.* (citing *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965) (internal citations omitted)); *See* also *Fuentes v. Shevin*, 407 U.S. 67, 80 (1972) (stating that the right to notice must also be granted at a meaningful time and in a meaningful manner).

What are necessary, therefore, are procedures "tailored, *in light of the decision to be made, to 'the capacities and circumstances of those who are to be heard...'* to insure that they are given a meaningful opportunity to present their case." *Id.* at 348-49 (quoting *Goldberg v. Kelly*, 397 U.S. 254, 268-69 (1970) (emphasis added)). These procedures are a recognition that "fairness can rarely

be obtained by secret, one-sided determination[s] of facts decisive of rights…." *Fuentes*, 407 U.S. at 81 (quoting *McGrath*, 341 U.S. at 170-72). Even when there has been an opportunity to be heard, though, the Supreme Court has "traditionally insisted … [the] opportunity for that hearing must be provided before the deprivation at issue takes effect." *Id.* at 82; *E.g.*, *Bell v. Burson*, 402 U.S. 535, 542 (1971); *Wisconsin v. Constantineau*, 400 U.S. 433, 437 (1971); *Goldberg*, 397 U.S. at 261; *Armstrong*, 380 U.S. at 551; *Mullane v. Central Hanover Tr. Co.*, 339 U.S. 306, 313 (1950); *Opp Cotton Mills v. Administrator*, 312 U.S. 126, 152—53 (1941); *United States v. Illinois Central R. Co.*, 291 U.S. 457, 463 (1934); *Londoner v. City & County of Denver*, 210 U.S. 373, 385—86 (1908).

Similar to count I, defendant argues under count II that plaintiff cannot allege facts sufficient to show a constructive discharge because her "own complaint admits she chose to voluntar[ily] resign in lieu of formal proceedings." (Doc. 23, ¶ 3; Doc. 24, pg. 5). Defendant believes that plaintiff chose to forgo the available due process procedures when she voluntarily resigned, rather than face the notice of charges giving cause for her termination. (Doc. 24, pg. 6). Thus, defendant states that plaintiff made a "careful and reasoned decision" not to exercise her due process rights, but to instead voluntarily resign. (Doc. 24, pg. 6).

Alternatively, plaintiff states her due process rights were violated when the letter outlining her two options "did not offer a name-clearing hearing, the right to contest any evidence or the right to be represented by counsel." (Doc. 26, pg. 4).

She argues that even if these things were provided, the fact that the outcomes were predetermined proved "no fair minded decision maker would be listening." (Doc. 26, pg. 4). Furthermore, plaintiff cites Supreme Court authority to show that "notice and an opportunity for a fair hearing ha[ve] long been required under the Fourteenth Amendment." (Doc. 26, pg. 5) (citing *Roth*, 408 U.S. at 576 and *Goss v. Lopez*, 419 U.S. 565, 579, 581 (1975)). Since these provisions were allegedly incorporated into the employment contract, plaintiff argues that she was entitled to them before the predetermined outcomes. (Doc. 26, pg. 5).

As a result of the predetermined outcomes, plaintiff contends that she was "never going to receive a fair hearing before a fair tribunal," which she states is "a basic requirement of due process... [that] requires an absence of actual bias...." (Doc. 26, pg. 5) (citing *In re Murchison*, 349 U.S. 133, 136 (1955); *Goldberg*, 397 U.S. at 271 (1970); *Wong Yang Sung v. McGrath*, 339 U.S. 33, 45-46, 50 (1950)). Essentially, plaintiff is making the argument that due process is violated when predetermined outcomes are made "by the very individuals who will make the decision affecting property interests and liberty interests of an individual's reputation and standing in their profession." (Doc. 26, pg. 5) (citing *Roth*, 408 U.S. at 569). This, plaintiff contends, is true even in the setting of "quasi-judicial tribunals," when "predetermined outcomes expressed even by one (1) member of the tribunal violates due process." (Doc. 26, pg. 5) (citing *Goldberg*, 397 U.S. at 271; *Zenith Corp. v. Hazeltine*, 395 U.S. 100, 123 (1969); *In re Murchison*, 349 U.S. at 139; *Texaco, Inc. v. F.T.C.*, 336 F.2d 754, 759-60 (D.C.

Cir. 1964); *Perlman v. Shasta Joint Junior College District Board of Trustees*, 9 Cal.App.3d 873 (1970); and, *Staton v. Mayes*, 552 F.2d 908, 915 (10th Cir. 1977)).

Further, plaintiff argues that the Title VII constructive discharge analysis is the same for due process claims. (Doc. 26, pg. 6) (citing *Parrett v. City of Connersville, Indiana, et. al.*, 737 F.2d 690 (7th Cir. 1984); *Witte*, 434 F.3d at 1035). Thus, the question of determining when "constructive discharge will be satisfied… is whether a reasonable employee would believe their future is hopeless." (Doc. 26, pg. 7). In making this argument, plaintiff distinguishes between showing an employer's communication that an employee *will* be terminated, versus the communication that he or she is facing the *prospect* of being terminated after fair due process. (Doc. 26, pg. 7). Plaintiff believes the former is a constructive discharge, while the latter is not. (Doc. 26, pg. 7) (citing *Univ. of Chi. Hosps.*, 276 F.3d at 332 and *Cigan v. Chippewa Falls School District*, 388 F.3d 331, 333 (7th Cir. 2004)). Because plaintiff claims the future of her career was not speculative, as the demotion to a teaching position with a lower retirement salary was memorialized in writing, she believes there was a "classic constructive discharge." (Doc. 26, pg. 7).

Here, the Court finds plaintiff has pled sufficient facts to make out a plausible claim for relief on the face of the complaint. Defendant has fair notice that plaintiff is alleging her due process rights were violated when she was not afforded a pre-discharge name-clearing hearing prior to receiving the

"predetermined outcomes." Even if the Court accepts that plaintiff *could have ultimately received* a hearing by choosing one of the "predetermined outcomes," the crux of her argument is that such a hearing would not have occurred at a meaningful time and in a meaningful manner. This is because the actions and procedures of defendant were not tailored to plaintiff's specific employment circumstances. She is alleging the precise one-sided determinations that due process seeks to protect against. Because plaintiff has sufficiently alleged facts supporting her contention that the "predetermined outcomes" deprived her of employment *before* the hearing, she has made out her claims for purposes of the motion to dismiss stage.

### c.  Count III: Violation of Fourteenth Amendment Liberty Interests.

Under count III, plaintiff states that she possessed a liberty interest in her personal and professional reputation to be free of "unwarranted, vicious, cruel, and slanderous accusations." (Doc. 15, ¶ 39). This interest was allegedly violated when defendant made the accusations at issue in this case and refused to allow plaintiff to confront her accusers. (Doc. 15, ¶ 40). As will be discussed, plaintiff pled sufficient facts for the allegations contained in count III.

There are a variety of interests that are difficult to define, yet are protected as a "liberty" or "property" under the Due Process Clause. *See Paul v.* Davis, 424 U.S. 693, 710 (1976). It has been recognized that "[w]here a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him, notice and an opportunity to be heard are essential." *Id.* at 711; *Roth*, 408

U.S. at 573 (quoting *Constantineau*, 400 U.S. at 437) (internal citations omitted); *See* also *Palka*, 623 F.3d at 454. However, damage to reputation alone cannot form the basis of a claim. *Id.* Instead, "it is only the 'alteration of legal status,' such as government deprivation of a right previously held, 'which, combined with the injury resulting from the defamation, justif[ies] the invocation of procedural safeguards.'" *Hinkle v. White*, 793 F.3d 764, 768 (2015) (quoting *Mann v. Vogel*, 707 F.3d 872, 878 (7th Cir. 2013) (internal citations omitted)). The relevant inquiry is whether there was "an injury to reputation *along* with a change in legal status…." *Id.* (quoting *Somerset House, Inc. v. Turnock*, 900 F.2d 1012, 1015 (7th Cir. 1990)). This Court has held that the two situations that threaten an employee's liberty interest when the government effects termination are "(1) when the employee's good name, reputation, honor or integrity is at risk by accusations of 'immorality, dishonesty, alcoholism, disloyalty, Communism or subversive acts"; or, "(2) the government inflicts 'stigma or other disability on the [employee] which forecloses other [employment] opportunities.'" *Austin v. Marion County Housing Authority*, No. 17-cv-00005-DRH-SCW, 2017 WL 2533521, slip op. at 5 (S.D. Ill. 2017).

Relative to count III, defendant argues that "the facts pled in the Complaint are not defamatory and, even if they were, the Complaint does not plead an alteration of legal status as a result of such alleged defamation." (Doc. 23, ¶ 4; Doc. 24, pg. 6) (citing *Babchuk v. Ind. Univ. Health, Inc.*, 809 F.3d 966 (7th Cir. 2016); *Hojnacki v. Klein-Acosta*, 285 F.3d 544, 548 (7th Cir. 2002); *Turnock*, 900

F.2d at 1015). Thus, defendant claims "[r]eputation alone… is neither a 'liberty' [n]or 'property' interest sufficient to invoke… the Due Process Clause, as there is "no constitutional doctrine converting every defamation by a public official into a deprivation of liberty…." (Doc. 24, pg. 7) (citing *Babchuk*, 809 F.3d at 969)). Defendant believes this to be true even where the defamation causes "serious impairment of one's future employment." (Doc. 24, pg. 7) (citing *Hojnacki*, 285 F.3d at 548). Similarly, defendant argues plaintiff does not have a "due process right to be exempt from formal procedures of [her] employer[] that could result in [her] being disciplined." (Doc. 24, pg. 8) (citing *Abcarian v. McDonald*, 617 F.3d 931, 942 (7th Cir. 2010)).

In response, plaintiff contends "the defamatory character of the accusations against her fit well under the precedent of the United States Supreme Court and the Seventh Circuit." (Doc. 25, ¶ 3; Doc. 26, pgs. 7-8). Also, she believes her termination satisfies a necessary element of her claim. (Doc. 25, ¶ 3; Doc. 26, pgs. 8). Specifically, she uses the two scenarios described as liberty violations in *Roth* to show that she has sufficiently pled a constructive discharge. (Doc. 26, pgs. 7-8).

Here, the Court finds plaintiff has pled sufficient facts to state a claim to relief that is plausible on the face of the complaint. Plaintiff has given defendant fair notice that she is claiming her Fourteenth Amendment liberty interest was violated when it made the accusations against her without providing the opportunity to confront her accusers. Opportunities to be heard and receive notice are essential when these types of accusations are being made. Further,

plaintiff is not solely alleging that she suffered damage to her reputation. Instead, she has sufficiently provided facts to show an injury to her right to continued employment as a result of the alleged defamation. When these facts are accepted as true for purposes of a motion to dismiss, they indicate an alteration of legal status combined with a defamation-causing injury, as well as the need for procedural safeguards.

### d. Counts I-III: *Monell* Liability

To state a § 1983 claim against a municipality, the complaint must allege that "an official policy or custom not only caused the constitutional violation, but was 'the moving force' behind it." *Sims*, 506 F.3d at 514 (citing *City of Canton, Ohio v. Harris*, 489 U.S. 378, 389 (1989). Further, under such a theory, "there is no respondeat superior liability... [as] the Supreme Court 'distinguish[es] acts of the *municipality* from acts of *employees* of the municipality.'" *Milestone v. City of Monroe, Wis.*, 665 F.3d 774, 780 (7th Cir. 2011) (quoting *Pembaur v. City of Cincinnati*, 475 U.S. 469, 479 (1986) (emphasis in original) (internal citations omitted)); *See* also *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 n. 58 (1978). In so doing, it limits liability to "action for which the municipality is actually responsible." *Pembaur*, 475 U.S. at 479. Thus, plaintiff must eventually prove the constitutional violation was caused by one of the following: "(1) an express municipal policy; (2) a widespread, though unwritten, custom or practice; or (3) a decision by a municipal agent with 'final policymaking authority.'" *Milestone,* 665

F.3d at 780 (quoting *Darchak v. City of Chi. Bd. of Educ.*, 580 F.3d 622, 629 (7th Cir. 2009)).

The question of "whether an entity has final policymaking authority is a question of state or local law." *Id.* (citing *Jett v. Dallas Indep. Sch. Dist.*, 492 U.S. 701, 737 (1989)); *See also Kujawski v. Bd. of Comm'rs*, 183 F.3d 734, 737 (7th Cir. 1999); *Darchak*, 580 F.3d at 630. However, "not every municipal official with discretion is a final policymaker," as "authority to make final policy in a given area requires more than mere discretion to act." *Id.* (citing *Darchak*, 580 F.3d at 630 and *Gernetzke v. Kenosha Unified Sch. Dist. No. 1*, 274 F.3d 464, 469 (7th Cir. 2001)). The relevant question is whether the official's "decisions are subject to review by a higher official or other authority." *Id.* (citing *Gernetzke*, 274 F.3d at 469).

Thus, the situations in which municipal liability is proper under this theory are limited to when "the official who commits the alleged violation… has authority that is final in the special sense that there is no higher authority." *Gernetzke*, 274 F.3d at 469. The official "must possess 'responsibility for making law or setting policy,' i.e. 'authority to adopt rules for the conduct of government,'" rather than "the mere authority to implement pre-existing rules…." *Killinger v. Johnson*, 389 F.3d 765, 771 (7th Cir. 2004) (citing *Rasche v. Village of Beecher*, 336 F.3d 588, 599, 601 (7th Cir. 2003) (internal citations omitted); *See also Auriemma v. Rice*, 957 F.2d 397, 400-01 (7th Cir. 1992)). Such authority "may be granted directly by a legislative enactment or may be delegated by an official who possesses such

authority...." *Rasche*, 336 F.3d at 600; *See* also *Pembaur*, 475 U.S. at 483; *Eversole v. Steele*, 59 F.3d 710, 716-17 (7th Cir. 1995). If the power is delegated, however, then the "person or entity with final policymaking authority must delegate the power to make policy, not simply the power to make decisions." *Darchak*, 580 F.3d at 630; *See* also *Kujawski*, 183 F.3d at 739.

The Seventh Circuit has also held that a single decision attributable to a municipality can create a cause of action under § 1983 if "the evidence that the municipality had acted and that the plaintiff had suffered a deprivation of federal rights also proved fault and causation." *Board of County Com'rs of Bryan County, Okl. v. Brown*, 520 U.S. 397, 405 (1997). This is true even where "a final decision maker's adoption of a course of action [is] 'tailored to a particular situation and not intended to control decisions in later situations...,'" as that adopted course of action by authorized decision makers "surely represents an act of official government 'policy' as that term is commonly understood." *Id.* at 406 (quoting *Pembaur*, 475 U.S. at 481); *Pembaur*, 475 U.S. at 481. "Where action is taken by those who establish governmental policy, the municipality is equally responsible whether that action is to be taken only once or to be taken repeatedly." *Pembaur*, 475 U.S. at 481.

Defendant argues that counts I-III should be dismissed because plaintiff has not sufficiently alleged constitutional violations to establish municipal liability. (Doc. 23, ¶ 5; Doc. 24, pg. 9). That is, plaintiff has not shown the violations were caused by either an official policy, custom, or decision by a final policymaker.

(Doc. 23, ¶ 5; Doc. 24, pg. 9-10) (citing *Milestone*, 665 F.3d at 780). Defendant argues this is necessary because "[g]overnmental entities, such as school districts, are generally not liable under § 1983 unless a plaintiff proves that the constitutional violation…" was caused by one of the above. (Doc. 24, pg. 9).

Defendant first argues that it cannot be sued as a state entity because the state is not a "person" within the meaning of § 1983. (Doc. 24, pg. 9). Second, defendant states that plaintiff cannot prevail by "showing merely that the superintendent of the district and the principal of their school acted within the scope of these officials' employment and therefore under color of state law, [to deprive] the plaintiffs of liberty." (Doc. 24, pg. 10). Rather, it states plaintiff must prove the district, i.e. the officials or official boards that have final decision making authority, were responsible for the deprivation. (Doc. 24, pg. 10) (citing *McMillian v. Monroe County*, 520 U.S. 781, 784-85 (1997); *Horowitz v. Board of Education*, 260 F.3d 602, 619 (7th Cir. 2001); *Baskin v. City of Des Plaines*, 138 F.3d 701, 705 (7th Cir. 1998)).

Third, defendant argues that because Illinois boards of education are given the final power and authority to employ and dismiss teachers, plaintiff's claims cannot stand. (Doc. 24, pg. 11) (citing *Gernetzke*, 274 F.3d at 469; 105 ILCS 5/10-21.1; 105 ILCS 5/24-12). In sum, defendant believes its status as a cooperative of school districts operating under the Illinois School Code, coupled with plaintiff's failure to plead facts that establish violations caused by one of the three prongs, bars recovery. (Doc. 24, pg. 11). Finally, defendant contends that

plaintiff does not state "any decision was made by an agent with 'final policymaking authority.'" (Doc. 24, pg. 11).

Plaintiff, in answering defendant's arguments, first alleges that her allegations against defendant are proper because BASSC is a local government entity, rather than a state entity or school district with a superintendent or principal. (Doc. 26, pgs. 8-9). Further, she believes her suit is proper since she was "an administrator to the Executive and Governing board" itself. (Doc. 26, pgs. 9). That is, defendant's cited authority regarding school boards having "final power and authority to employ and dismiss teachers" is irrelevant, as "there is no school board in BASSC, no superintendents, and no principals." (Doc. 26, pgs. 10). This shows that BASSC is its own self-governing entity with the final decision making authority to cause plaintiff's constructive discharge and violate her constitutional rights. (Doc. 26, pgs. 10). What is more, plaintiff believes her § 1983 claim was established against BASSC as a municipal entity by the single decision of Mr. Stines to write the letter outlining her two options in his capacity as chairperson of the executive board. (Doc. 26, pgs. 10) (citing *Pembaur*, 475 U.S. at 481). This is because Mr. Stines' letter to plaintiff was on behalf of the entire board, thereby constituting a "single decision of the policymaker(s)[,] reflecting official policy which gave rise to this lawsuit." (Doc. 26, pgs. 11).

Here, the Court finds plaintiff has provided sufficient facts to make out a facially plausible claim of municipal liability. Defendant has fair notice that she is alleging violations of § 1983 through the single decision of Mr. Stines as

chairperson, on behalf of the entire board, to send plaintiff a letter outlining the two "predetermined outcomes." Through well-pleaded facts, plaintiff has alleged that an official policy by a final policymaker, i.e. Mr. Stines and the board, was the "moving force" behind her constructive discharge and deprivation of constitutional rights. If ultimately proven to be factual, this single decision could solely establish fault and causation. Further, plaintiff has stated Mr. Stines and the board held the responsibility for making law or setting policy in the area of her continued employment. As noted above in *McCormick*, these allegations are more than enough to survive the motion to dismiss stage.

### e. Count IV: Violations of Titles I and II of the Americans with Disabilities Act (Retaliatory Discharge).

Under count IV, plaintiff states that she was constructively discharged because "she had created and enforced policies which advocated for students with disabilities under the IDEA and ADA." (Doc. 15, ¶ 45). She allegedly "enforced regulations and rules prohibiting the use of arrests, isolation, seclusion and restraint," which she believed violated the rights of students with disabilities under those statutes. (Doc. 15, ¶ 45). Plaintiff supports this claim by stating that Mr. Stines and Mr. Mundorf called her "advocacy for those students, and the policies she created," in the words of plaintiff, the "most serious" of her offenses. (Doc. 15, ¶ 45). Further, she claims to have exhausted her administrative prerequisites by obtaining the right to sue from the Equal Employment Opportunity Commission on April 15, 2016. (Doc. 15, ¶ 51). As will be discussed, plaintiff pled sufficient facts for the allegations contained in count IV.

The ADA's retaliation provision "protects *any* individual who 'has opposed an act or practice made unlawful by [the ADA] or… has made a charge [under the ADA].'" *Silk v. City of Chicago*, 194 F.3d 788, 799 (7th Cir. 1999) (emphasis added); 42 U.S.C. § 12203(a). Further, that provision makes it unlawful to "coerce, intimidate, or interfere with *any* individual… on account of his or her having *aided or encouraged any other individual* in the exercise or enjoyment of, any right granted or protected by [the ADA]." 42 U.S.C. § 12203(b) (emphasis added). Absent direct evidence of retaliatory animus, the plaintiff can show a prima facie case of retaliation by pointing to the following: (1) he or she engaged in statutorily protected expression; (2) he or she suffered an adverse action; and (3) there is a causal link between the protected expression and the adverse action. *Silk*, 194 F.3d at 799 (citing *Talanda v. KFC Nat'l Management Co.*, 140 F.3d 1090, 1095 (7th Cir. 1998); *See* also *Davidson v. Midelfort Clinic, Ltd.*, 133 F.3d 499, 511 (7th Cir. 1998)). As to the second prong, "adverse action" has been defined broadly, encompassing "job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." *Id.* at 800 (citing 42 U.S.C. § 12112(a)); *See* also *Rabinovitz v. Pena*, 89 F.3d 482, 488 (7th Cir. 1996).

Defendant argues count IV should be dismissed because it does not state that plaintiff "suffered an adverse action by her employer and does not allege a but-for causal link between an alleged protected expression and the alleged adverse action," as required for a prima facie case of retaliation under the ADA.

(Doc. 23, ¶ 6; Doc. 24, pg. 12) (citing *Cloe v. City of Indianapolis*, 712 F.3d 1171, 1180 (7th Cir. 2013); *Dickerson v. Bd. of Trs.*, 657 F.3d 595, 601 (7th Cir. 2011)). Because plaintiff "voluntarily chose to resign," and nothing in the complaint "demonstrates working conditions so intolerable or unendurable that a reasonable person would feel compelled to resign," defendant argues that she has failed to allege an adverse employment action. (Doc. 24, pg. 13). Further, defendant argues that it was the "difficult decision" of choosing between the two options given to her that constituted but-for cause for the resignation, rather than being "retaliated against for engaging in [the] protected activity" of advocating for her students. (Doc. 24, pg. 14). In fact, defendant states plaintiff fails to show how her advocacy was even connected to her discharge. (Doc. 24, pg. 14).

Plaintiff counters by alleging that defendant ignores the factual allegations contained in the first amended complaint, which states "the 'most serious' misconduct was Plaintiff's opposition to unlawful isolation and restraint of students." (Doc. 25, ¶ 5). Plaintiff argues it was precisely because she opposed the previously utilized employment practices of "arrest, isolation, seclusion, and restraint," thereby advocating for students with disabilities under the IDEA and ADA, that she suffered a retaliatory discharge. (Doc. 26, pg. 11). According to plaintiff, these allegations and the facts that support them, along with her exhaustion of administrative remedies, sufficiently make out her claim. (Doc. 26, pg. 11).

Here, the Court finds plaintiff has sufficiently alleged facts that give rise to a facially plausible claim for relief for violations of the ADA. Defendant has fair notice of plaintiff's allegations of retaliatory discharge for implementing policies she believed advocated for students under the ADA and IDEA. Plaintiff's alleged facts fit squarely within the ADA's protections for *any* individual who *opposed* an act or practice made unlawful by that statute, as plaintiff's policies were in response to the alleged arrests, isolation, seclusion and restraint of students. In fact, she has specifically stated that Mr. Stines and Mr. Mundorf expressly referenced this advocacy, i.e. statutorily protected expression, as her most serious offense. This establishes the necessary causal link between her advocacy and the adverse action of being retaliated against. What is more, this claimed adverse action falls squarely within the employment examples cited in *Silk*. Reasonable inferences can be drawn about the improper coercion, intimidation, and interference with plaintiff by defendant that resulted after she aided or encouraged those students.

### f.  <u>Breach of Written Employment Contract.</u>

Under count V, plaintiff states that she entered into a written contract of employment through June of 2017. (Doc. 15, ¶ 53). Despite this, she is claiming a breach by way of constructive discharge. (Doc. 15, ¶ 54).

Under Illinois law, "a person has a property interest in his job only where he has a legitimate expectation of continued employment based on a legitimate claim of entitlement." *Cromwell v. City of Momence*, 713 F.3d 361, 364 (7th Cir.

2013) (citing *Moss v. Martin*, 473 F.3d 694, 700 (7th Cir. 2007) (internal citations omitted)). Because employment relationships in Illinois are presumed to be at will, an expectation of continued employment must be shown through a "substantive state-law predicate." *Id.* (quoting *Omosegbon*, 335 F.3d at 674). In other words, there must be "a specific ordinance, state law, contract or understanding limiting the ability of the state or state entity to discharge him." *Rujawitz*, 561 F.3d at 688 (quoting *Moss*, 473 at 700; *Krecek*, 646 N.E.2d at 1319). In the contracting sense, "the terms of employment must provide that termination will only be 'for cause' or 'otherwise evince mutually explicit understandings of continued employment.'" *Cromwell*, 713 F.3d at 364 (quoting *Omosegbon*, 335 F.3d at 674); *See* also *Garrido v. Cook Cnty. Sheriff's Merit Bd.*, 811 N.E.2d 312, 319 (Ill. App. Ct. 2004) (As "a public employee who could only be terminated for cause," the petitioner "enjoyed a property interest in her continued employment…").

Defendant contends that count V must be dismissed because there is no "stand-alone" constructive discharge claim in Illinois. (Doc. 23, ¶ 7; Doc. 24, pg. 14) (citing *Opal v. Cencom E 911*, 1994 U.S. Dist. LEXIS 14602, *20-21 (N.D. Ill. Oct. 5, 1994); *Dudycz*, 563 N.E.2d at 1127). Further, defendant claims that plaintiff was "presented with two choices and made a reasoned decision based on those circumstances." (Doc. 24, pg. 15). Rather than a constructive discharge, defendant argues plaintiff made a "decision to mutually and voluntarily terminate the employment contract." (Doc. 24, pg. 15). Defendant believes that even if a

breach of contract premised on a theory of constructive discharge were possible, the voluntariness of plaintiff's resignation shows insufficient facts for such a claim. (Doc. 24, pg. 15).

Plaintiff, however, argues that she is pleading a "written, fixed-term contract requiring discharge only for 'just cause,'" rather than at-will employment. (Doc. 25, ¶ 6; Doc. 26, pg. 12). A breach of contract, especially one with a "just cause" provision, has nothing to do with at-will employment. (Doc. 26, pg. 12). Rather, she cites authority for the proposition that the "at-will" doctrine does not apply when there is a written contract, and that a demotion is a breach. (Doc. 26, pg. 12) (citing *Arneson v. Board of Trustees, McKendree College*, 569 N.E. 2d 252, 256-58 (5th Dist. 1991).

Here, the Court finds plaintiff has made sufficient factual allegations to state a facially plausible claim to relief for breach of contract. Defendant has fair notice that plaintiff is alleging her written employment contract was breached when she received the "predetermined outcomes" and was, thus, constructively discharged. As was discussed in count I, plaintiff has a legitimate claim of entitlement to continued employment. This is true because she has alleged a substantive state law predicate, i.e. a written contract, which contained a "for cause" provision and certain procedural requirements that limited the ability of defendant to effectuate her discharge. For the time being, these allegations must be accepted as true, and the Court finds that plaintiff pled sufficient facts for the allegations contained in count V.

### V.    Conclusion

Accordingly, the Court **DENIES** defendant's motion to dismiss plaintiff's

first amended complaint (Doc. 23).

**IT IS SO ORDERED.**

Digitally signed by
Judge David R.
Herndon
Date: 2017.09.07
17:19:22 -05'00'

**United States District Judge**